No. 13,130.

Mrs. Ursules Gagneaux, Wife, vs. Louis C. Desonier, Husband.

Syllabus.

1. Where, in a suit for separation from bed and board, brought by a wife, upon the grounds of habitual intemperance, cruel treatment, and public defamation, several unimpeached witnesses, including adult children of the marriage, testify, affirmatively, to specific conduct on the part of the defendant, sustaining the charges contained in the petition, such testimony will not ordinarily be considered rebutted by the testimony of witnesses for the defendant, establishing for him a good general character or reputation.

2. Where the evidence in such a case shows that during a series of years, preceding the institution of the suit, the defendant husband has been a regular drinker of intoxicating liquor; that he has been quarrelsome and abusive at home; that his wife has, on several occasions, left the common domicile; that his children have, one after another, left the paternal roof at their father's command, or with unfriendly feeling; and that the defendant has on more than one occasion, in presence of the adult children of the marriage, and of other persons, made the vilest charges and insinuations against his wife, the latter is entitled to a separation.

8.    The alimony to be allowed in such a case should be regulated by the rev-
      enues of the community property, considered in connection with the earn-
      ing capacity of the husband, and the amount required for the wife's sup
      port.

ON APPEAL from the Twenty-fourth Judicial District Court for
the Parish of St. Mary.    *Allen, J.*

*Milling & Sanders* for Plaintiff, Appellee.

*D. Caffery & Son,* and *J. Sully Martel* for Defendant, Appellant.

Argued and submitted April 18, 1899.
Opinion handed down May 1, 1899.

The opinion of the court was delivered by

MONROE, J.    This is a suit for separation from bed and board, and
for a dissolution of the community, upon the grounds of habitual
drunkenness, excesses, and cruel treatment, and public defamation.
Plaintiff obtained an injunction, *in limine,* restraining defendant
from disposing of community property, and by supplemental petition,
prayed for alimony.

Defendant, after an unsuccessful attempt to set aside the injunc-
tion, answered, admitting the marriage, and denying all the other
allegations of the petition.

There was judgment for plaintiff in the court  *a qua,*  from which
defendant has appealed, and plaintiff answers, praying that the judg-
ment be amended by increasing the allowance for alimony, and in
other respects affirmed.

The evidence shows that the defendant came from Canada, to Louis-
iana, many years ago, and found a wife among the Creole young
ladies of this State.    With her he moved to the parish of St. Mary,
where they have lived for more than thirty years.    Ten children were
born of the marriage, of whom but three are living at this time, viz.:
Henry, aged thirty-nine; Alcide, aged twenty-six, and a married
daughter, Mrs. Boudreaux.    Joseph, another son, died within the past
four or five years, and left a widow and one child.    The other children
appear to have left no issue.    Defendant and his wife have acquired,
in community, real estate consisting of a dozen small tenements, the

rental value of which is said to be from $3 to $5 per month each (but which are not always rented), and the residence in which they lived, with garden attached, worth about $6 per month. They have also some live stock and other movables; the total value of the community property approximating $10,000.

It further appears that about twelve or fourteen years ago, the defendant said to his oldest, surviving son: "I am going to put the whole shooting place out, and sweep the place clean," and that the son thereupon left, and went to Galveston, and elsewhere, and only returned to Sorrel, where his parents lived, in 1896, after an absence of eleven years, and that he has his own blacksmith shop, and lives in his own house.

That, a few years later, Alcide, another son, having reached the age of seventeen, was turned adrift by his father, and, since then, has shifted for himself, and, in some way, picked up the trade, or profession of electrician, by which he now makes his living. That, in 1892, still another son, Joseph, married and lived with his wife for a few months, under the parental roof, when he too left, for some cause unexplained, but, under such circumstances, that there was little or no communication between his family and his father's, thereafter, until he died, two or three years later. That in 1892, the plaintiff, with the only remaining, and youngest, child, who afterwards became Mrs. Boudreaux, left their home in consequence of some trouble or misunderstanding with the defendant, but returned after a short absence, after which, the daughter married Boudreaux and was taken to a home of her own, and the old couple were left to themselves. In 1896, however, as it appears, the plaintiff again left the house and remained away for nine months, staying with her children. She again returned to her husband, but from that time up to December, 1897, when she again left him, she frequently went, for a night at a time, to the house of her daughter-in-law in alarm and distress. Finally, in December, 1897, she went with her son to Franklin to consult an attorney, and upon their return, they were accosted by the defendant, who inquired, and was informed, where they had been, and thereupon used such language towards and concerning his wife, as no wife, mother, or woman, could well forgive. If there was no other evidence of similar purport in the record, it might be said that a single ebullition of temper, provoked by the circumstances stated, ought to, or might, be condoned, but there is proof that on other occasions, in the presence of

other children of the marriage, and of third persons, the defendant had made the vilest and most infamous charges against the plaintiff. It is in evidence that they had little or nothing to do with each other, though living in the same house; that she did not occupy the same room or sit at the table with him; and that he rarely spoke to her, unless to curse and abuse, or to sneer at the Creoles as cattle and animals, upon which occasions she sometimes retaliated in kind, and, at other times, sought refuge at the house of her daughter-in-law.

Precisely why the sons were turned out by their father, and why the wife left the common domicile, on the several occasions mentioned, does not clearly appear. If there had been troubles with the wife alone, the blame might be imputed to her. If there had been troubles between the wife and one son, and the defendant, and no explanation, the presumption would be rather against the defendant, but when a man manages to get upon bad terms with his whole family, one after the other, and when it appears, as it does from this record, that he indulges regularly in the use, or abuse, of intoxicating liquor, and, upon occasions, for a week at a time, purchases and disposes of as much as a quart of whiskey a day, the presumption is decidedly against him, and this presumption is strengthened, and we are able to read between the lines, and account for that which is unexplained, when we consider the affirmative testimony as to the defendant's conduct and language towards and concerning his wife, because that conduct and language shows of what the defendant is capable.

It is suggested, however, that in view of the testimony of the defendant's witneses as to his general character, and as to their ignorance of any misconduct on his part, the court should believe him incapable of such misconduct, in spite of the affirmative testimony to the contrary. The difficulty, in the way of the adoption of this theory, is that the witnesses who testify to the misconduct refer to specific and affirmative facts, which must be as they state or else they are committing perjury. They seem to be respectable people (with two exceptions—defendant's own children), and are wholly unimpeached. The defendant's witnesses, also unimpeached, merely testify to what they know of the defendant from casual or business acquaintance, and give us the benefit of their knowledge, or ignorance, of his conduct at home, as based upon visits more or less unfrequent, and observations made whilst passing along the public road; so that it is easy to believe that all the witnesses are testifying truthfully, and if they are, then

the plaintiff's case is made out, whereas in order to hold that the defense is sustained, we must conclude that all of the plaintiff's witnesses have testified falsely, for which there can be no possible justification, since their testimony is strongly corroborated by facts which, are undisputed, and they, themselves, are unimpeached.

It is asked that the amount allowed to the plaintiff as alimony be increased. The evidence shows that the rental of the real estate belonging to the community can hardly be less than $36 per month, in addition to which defendant has the occupancy of the matrimonial domicile, and the use of the movables. He has also an earning capacity, and a trade, or profession, out of which he ought easily to, make a living. Under these circumstances, $10 a month is rather a scant allowance, which might well be increased to $15.

It is therefore ordered, adjudged and decreed, that the judgment appealed from be amended by increasing the amount allowed plaintiff, as alimony, from $10 per month to $15 per month, such increase to take effect from the date from which alimony was originally allowed, and, in all other respects, that said judgment be affirmed; defendant to pay all costs in both courts.